IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA

[UNDER SEAL],

        v.

[UNDER SEAL].

Filed in Camera
and Under Seal

Civil Case No. _____

DO NOT PLACE ON PACER
DO NOT SERVE DEFENDANTS
DO NOT PLACE IN PRESS BOX

# FILED UNDER SEAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>ex rel. Andrew Conkovich, Relator,<br><br>State of Louisiana, ex rel. Andrew<br>Conkovich, Relator<br><br>vs.<br><br><br>Biomedical Research Foundation of<br>Northwest Louisiana, Inc., BRF Hospital<br>Holdings L.L.C., BRFHH Shreveport,<br>L.L.C., BRFHH Monroe, L.L.C., and the<br>Board of Supervisors of Louisiana State<br>University and Agricultural and<br>Mechanical College, | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. _____<br><br>JURY TRIAL DEMAND<br><br>**FILED IN CAMERA<br>AND UNDER SEAL<br>PURSUANT TO<br>31 U.S.C. § 3730**<br><br>**DO NOT ENTER INTO PACER**<br><br>**DO NOT PLACE IN PRESS BOX** |

Defendants.

## COMPLAINT FOR DAMAGES UNDER THE FEDERAL FALSE CLAIMS ACT AND VARIOUS STATE FALSE CLAIMS ACTS AND DEMAND FOR JURY TRIAL

### I.     INTRODUCTION

1.       At different times from 2005 through to 2015, Defendants were responsible for operating and managing two hospitals in Louisiana, University Health Shreveport (formerly LSU Medical Center)("Shreveport") and University Health Monroe (formerly E.A. Conway Medical Center)("Monroe").  Since at least 2005, Shreveport, and since 2014, Monroe, have submitted claims to the government for payment and approval relating to the provision of implantable cardioverter defibrillators ("ICDs") to patients.  Between 2005 and mid-2015, both Shreveport and Monroe, despite billing for, collecting, and keeping government reimbursement for these procedures, have willfully failed to comply with the relevant CMS Billing Requirements of the

National Coverage Determination ("NCD") governing Medicare coverage of primary prevention ICDs.

2.          Specifically, since the inception of the requirement in 2005 through late 2015, neither Shreveport nor Monroe ever enrolled themselves (or patients) into the ICD data collection system as required by CMS.  When Relator, working as the director of compliance for Shreveport, brought these omissions to the attention of the highest levels of administration, Shreveport and Monroe's ultimate response was to acknowledge the deficiency, calculate some of what they owed Medicare, and then to bury the work of Relator's senior investigator who worked on the matter and quarantine her computer.

3.          CMS's Billing Requirements for ICD patients explicitly provides: "Effective for dates of service on or after April 1, 2005, Medicare required that patients receiving a defibrillator for the primary prevention of sudden cardiac arrest be enrolled in a qualifying data collection system."  Medicare Claims Processing Manual ("CPM"), Chapter 32 – Billing Requirements for Special Services, sec. 270.2.

4.          The CMS National Coverage Determination enumerates nine covered indications and identifies the six primary prevention indications as also requiring that each beneficiary receiving an ICD be enrolled in either an approved clinical trial or "a qualified data collection system." National Coverage Determination for Implantable Automatic Defibrillators (20.4).

5.          On October 27, 2005, CMS announced that a hospital's enrollment in the American College of Cardiology National Cardiovascular Data Registry's (ACC-NCDR) ICD Registry satisfied the data reporting requirements of the NCD with respect to primary prevention procedures.  CMS made the transition to the ACC-NCDR permanent and issued guidance about the changes, explaining: "Reporting data for primary prevention ICD implants **is a requirement**

**of Medicare coverage.  In order to obtain reimbursement**, Medicare national coverage policy requires that providers implanting ICDs for primary prevention clinical indications (i.e. patients without a history of cardiac arrest or spontaneous arrhythmia) report data on each primary prevention ICD procedure."  CMS Manual System, Pub 100-20, Transmittal 200, January 13, 2006.

6.      The CPM also makes clear that a condition precedent of billing is the ICD patient's existing enrollment in a data collection system – "Billing Requirements for Patients **Enrolled** . . ."  Absent the enrollment, the hospital cannot bill CMS for the ICD implantation services or device.

7.      For ICD claims submitted to CMS without the required data collection enrollment, CMS is entitled to claw back the reimbursement paid to the hospitals.  Id., "If the data is not provided to the ICD registry, then CMS will recoup payment from those hospitals that do not submit information."  American Hospital Association, Regulatory Advisory, December 16, 2005.

8.      The ACC-NCDR requires annual enrollment and a yearly payment for each hospital where ICDs are provided.  Both Shreveport and Monroe were required to enroll and maintain their memberships separately.  For calendar year 2014, the required payment to maintain enrollment in the ICD registry was $5400.

9.      The ACC-NCDR enrollment documents also require a "one-time implementation fee" for each new enrollee.  In indicating the applicability of the initial enrollment fee, hospitals check a box on the ACC-NCDR form that reads "We're new!" (original punctuation).  In calendar year 2014, the One-time Implementation Fee was $1000.

10.     Shreveport and Monroe did not enroll in the ACC-NCDR until 2015. Both Shreveport and Monroe's ACC-NCDR enrollment forms from 2015 show a check mark in the "We're new!" box and also show that both hospitals each made $1000 One-time Implementation Fee payments.

11.     During the period from 2005 until their respective enrollments in 2015, both Shreveport and Monroe performed primary prevention ICD procedures for patients.

12.     None of those pre-ACC-NCDR enrollment procedures complied with CMS's NCD and other published coverage and billing requirements.

13.     Throughout the time prior to enrollment in the ACC-NCDR, both Shreveport and Monroe submitted claims for payment to CMS for primary prevention ICD procedures.

14.     Throughout the time prior to enrollment in the ACC-NCDR, both Shreveport and Monroe received government money as a result of their claims for payment.

## II.     PARTIES

15.     Relator **Andrew Conkovich** is a citizen of the United States and resides in the state of Texas. He was hired as the Chief Compliance Officer of University Health, Shreveport in April of 2014. Relator holds a certification in Healthcare Compliance and a Master's in Business Administration. Relator worked as the Chief Compliance Officer until about September 2015. While working in this capacity, Relator lived in Shreveport, Louisiana.

16.     The facts averred herein are based upon the personal observations of Relator and documents in his possession.

17.     Prior to filing this complaint Relator provided to the United States Attorney and the Attorney General of Louisiana a full disclosure of all substantially material facts, as required

by the False Claims Act ("FCA") 31 U.S.C. sec. 3730(b)(2) and the Medical Assistance Programs Integrity Law.

18.     Defendant Biomedical Research Foundation of Northwest Louisiana is incorporated in Louisiana and has its principal place of business and domicile at 2031 King's Highway, Shreveport, LA 71103. Defendant is responsible for the operation and management of the Shreveport hospital (located at 1541 King's Highway, Shreveport, LA 71103) and the Monroe hospital (located at 4864 Jackson Street, Monroe, LA 71202). This Defendant is also an officer/manager of Defendant BRF Hospital Holdings, L.L.C.  As alleged herein, Defendant knowingly submitted or caused to be submitted claims for payment or approval related to Shreveport and Monroe's implantation of ICDs in such a way as to violate the FCA.

19.     Defendant BRF Hospital Holdings, L.L.C. is incorporated in Louisiana and has its principal place of business and domicile at 2031 King's Highway, Shreveport, LA 71103. Defendant is responsible for the operation and management of the Shreveport and Monroe hospitals.  This Defendant is also an officer/manager of Defendants BRFHH Shreveport, L.L.C. and BRFHH Monroe, L.L.C.  This Defendant is also the registered holder of the trade name, "University Health System." As alleged herein, Defendant knowingly submitted or caused to be submitted claims for payment or approval related to Shreveport and Monroe's implantation of ICDs in such a way as to violate the FCA.

20.     BRFHH Shreveport, L.L.C. is incorporated in Louisiana and has its principal place of business and domicile at 2031 King's Highway, Shreveport, LA 71103. Defendant is responsible for the operation and management of the Shreveport hospital. This Defendant is also the registered holder of the trade name, "University Health Shreveport."   As alleged herein,

Defendant knowingly submitted or caused to be submitted claims for payment or approval related to Shreveport and Monroe's implantation of ICDs in such a way as to violate the FCA.

21.    BRFHH Monroe, L.L.C. is incorporated in Louisiana and has its principal place of business and domicile at 2031 King's Highway, Shreveport, LA 71103. Defendant is responsible for the operation and management of the Monroe hospital. This Defendant is also the registered holder of the trade name, "University Health Monroe." As alleged herein, Defendant knowingly submitted or caused to be submitted claims for payment or approval related to Shreveport and Monroe's implantation of ICDs in such a way as to violate the FCA.

22.    Board of Supervisors of Louisiana State University and Agricultural and Mechanical College ("the Board') is a public constitutional corporation of the State of Louisiana.

23.    Defendants Biomedical Research Foundation of Northwest Louisiana, Inc., BRF Hospital Holdings L.L.C., BRFHH Shreveport, L.L.C., BRFHH Monroe, L.L.C., ("the non-Board Defendants") have managed and operated the Shreveport and Monroe hospitals since October 1, 2013. Prior to that time, both hospitals were part of the Louisiana State University Health System, and were managed and operated by the Board.

### III.    JURISDICTION AND VENUE

24.    This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This court also has jurisdiction pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1331. Supplemental jurisdiction for Count Two arises under 28 U.S.C. § 1367, since this claim is so related to the federal claims that it forms part of the same case or controversy under Article III of the U.S. Constitution.

25.      At all times material to this Complaint Defendants regularly conducted substantial business within the State of Louisiana and maintained permanent employees and offices in Louisiana.  Defendants are thus subject to personal jurisdiction in Louisiana.

26.      Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this district and are domiciled in this district.

## IV.    FACTS

### A.  Coverage for Implantable Cardioverter Defibrillators

27.      Implantable cardioverter defibrillator devices ("ICDs") are designed to treat people suffering from abnormal heart rates. ICD devices detect abnormal heart rhythms, and administer an appropriate electric shock to restore the heart's beating pattern to a normal rhythm.

28.      The Centers for Medicare and Medicaid Services, ("CMS") decides which items and services are covered by its programs.  In the furtherance of making its coverage decisions public, CMS will issue National Coverage Determinations, which constitute nationwide-applicable determinations of whether, and under what circumstances, CMS will pay for a particular item or service.

29.      The CMS National Coverage Determination enumerates nine covered indications and identifies the six primary prevention indications as also requiring that each beneficiary receiving an ICD be enrolled in either an FDA-approved clinical trial, a trial under the CMS Clinical Trial Policy, or "a qualified data collection system."  National Coverage Determination for Implantable Automatic Defibrillators (20.4).

30.      In order to satisfy the NCD by enrollment through either an FDA or CMS clinical trial, a hospital must request status as a clinical trial site, complete a trial protocol and meet institutional review board requirements.

31.      Neither the Shreveport nor the Monroe hospitals are approved clinical trial sites under either the FDA or CMS protocols.

32.      The only way for Shreveport or Monroe to satisfy the relevant prong of the ICD NCD, therefore, was to enroll in a qualified data collection system, and, ultimately, the ACC-NCDR.

33.      CMS has stated its reasons for the necessity of adequate data collection in its Decision Memo for Implantable Defibrillators (CAG-00157R3):

> "To maximize the benefits from ICD use, we desire to ensure that defibrillator implantation only occurs in those patients who are most likely to benefit and that the procedures are done only by competent providers in facilities with a history of good outcomes and a quality assessment/improvement program to identify providers with poor outcomes and other areas for improvement . . . In order to provide maximum net benefit to our beneficiaries, CMS will require that reimbursement for ICDs for primary prevention of sudden cardiac death occur only if the beneficiary receiving the defibrillator implantation is enrolled in either a [FDA or CMS clinical trial] or a qualifying data collection system . . .

34.      The Decision Memo continues, "The submission of data on patients receiving an ICD for primary prevention to a data collection process is needed to assure patient safety and protection and to determine if the ICD is reasonable and necessary."

35.      The data collected by CMS for each patient enrolled through the ACC-NCDR is voluminous.  There are more than 300 distinct data fields to be completed on behalf of each beneficiary receiving an ICD at Shreveport or Monroe.

36.      CMS's Billing Requirements for ICD patients explicitly provides: "Effective for dates of service on or after April 1, 2005, Medicare required that patients receiving a defibrillator for the primary prevention of sudden cardiac arrest be enrolled in a qualifying data collection system." Medicare Claims Processing Manual ("CPM"), Chapter 32 – Billing Requirements for Special Services, sec. 270.2.

37.     The CPM also makes clear that a condition precedent of billing is the ICD patient's existing enrollment in a data collection system – "Billing Requirements for Patients **_Enrolled_** . . ." Absent the enrollment, the hospital cannot bill CMS for the ICD implantation services or device.

38.     On October 27, 2005, CMS announced that a hospital's enrollment in the American College of Cardiology National Cardiovascular Data Registry's (ACC-NCDR) ICD Registry satisfied the data reporting requirements of the NCD with respect to primary prevention procedures.  CMS made the transition to the ACC-NCDR permanent and issued guidance about the changes, reaffirming that: "Reporting data for primary prevention ICD implants **is a requirement of Medicare coverage.  In order to obtain reimbursement**, Medicare national coverage policy requires that providers implanting ICDs for primary prevention clinical indications (i.e. patients without a history of cardiac arrest or spontaneous arrhythmia) report data on each primary prevention ICD procedure."  CMS Manual System, Pub 100-20, Transmittal 200, January 13, 2006.

39.     Transmittal 200 also went into detail about mandatory notice requirements incumbent upon each hospital and provider's fiscal intermediary related to the data collection requirements.  For each requirement containing the term "shall," CMS specified that "Shall denotes a mandatory requirement":

"Fiscal intermediaries (FIs) shall be aware that effective April 1, 2006, the Implantable Cardioverter Defibrillator (ICD) Abstraction Tool through the Quality Network Exchange System (QNet) will be replaced with the American College of Cardiology Cardiovascular Data Registry's (ACC_NCDR) ICD Registry for purposes of Medicare data reporting requirements for primary prevention ICD implants.

FIs shall be aware that no later than April 1, 2006, all ICD implanting hospitals within their respective jurisdiction must be fully transitioned and enrolled with the ACC-NCDR ICD

Registry and begin reporting their primary prevention ICD procedure data to the ACC-NCDR.

FIs shall be aware that no later than January 1, 2006, all ICD implanting hospitals within their respective jurisdiction must begin the registry transition process by contacting the ACC-NCDR directly.

FIs shall follow the instructions outlined in the Joint Signature Memorandum (JSM) #06067 dated November 30, 2005, subject: Letter from Office of Clinical Standards and Quality Addressed to Hospital Chief Executive Officers (CEOs), sent under separate cover, and outlined in this CR.

No later than December 15, 2005, FIs shall send via U.S. postage service, hardcopy letters sent under separate cover as an attachment to JSM #06067, to the attention of all hospital CEOs within their respective jurisdiction."

40.      Thus, not only did CMS publish multiple notices related to its data collection requirements for ICD procedures, CMS also directed fiscal intermediaries across the country to take affirmative steps to educate the hospitals in their jurisdiction and to ensure each hospital's participation in the ACC-NCDR.

41.      For ICD claims submitted to CMS without the required data collection enrollment, CMS is entitled to claw back the reimbursement paid to the hospitals.  Id., "If the data is not provided to the ICD registry, then CMS will recoup payment from those hospitals that do not submit information."  American Hospital Association, Regulatory Advisory, December 16, 2005.

42.      All of the above regulations and requirements requiring hospital registry in the ACC-NCDR (and its predecessor) have been in full force and effect since 2005.  At no time from 2005 to the present did CMS not require, or otherwise waive, the data registry requirements for hospitals performing primary prevention ICD procedures for government beneficiaries.

43.    ·In addition to the rules, regulation, and guidance offered by CMS and the AHA, ICD device manufacturers, including manufacturers whose devices were implanted in Shreveport and Monroe, provided notification to hospital clients about the NCD data registry requirements.

**B.    Shreveport and Monroe Failed to Register for the ACC-NCDR Until 2015**

44.    Despite the well-known and well-documented data registry requirements, Shreveport and Monroe did not enroll in the ACC-NCDR until 2015.

45.    Shreveport's enrollment in the ACC-NCDR became effective on or about July 21, 2015.  Prior to that time, Shreveport was never enrolled in any approved data collection system as required by CMS, including the ACC-NCDR.

46.    Monroe's enrollment in the ACC-NCDR became effective on or about August 14, 2015.  Prior to that time, Monroe was not enrolled in any approved data collection system as required by CMS, including the ACC-NCDR.

47.    When Shreveport did finally enroll in the ACC-NCDR, the enrollment form indicated that Shreveport had not previously enrolled in the registry.  Because Shreveport had not previously enrolled, it checked the "We're New!" box on its enrollment form and paid an additional "One-time Implementation Fee."

48.    When Monroe did finally enroll in the ACC-NCDR, the enrollment form indicated that Monroe had not previously enrolled in the registry.  Because Monroe had not previously enrolled, it checked the "We're New!" box on its enrollment form and paid an additional "One-time Implementation Fee."

49.    Even had Shreveport and/or Monroe enrolled in an NCD-compliant data collection program prior to 2015, each would have had to renew its enrollment each year (paying

a fee each year) it continued to provide ICD services to government beneficiaries.  Thus, each year they declined to enroll is a separate failure.

50.       Because Shreveport and Monroe failed to comply with a condition of payment – the data registry – neither hospital can retroactively justify and retain past payments from CMS by now providing data for all past primary prevention ICD recipients, nunc pro tunc.  In order for Shreveport and Monroe's ICD claims to have been payable by CMS, they would have had to fully comply with the NCD prior to the rendering of the services.

## C.    Relator's Experience

51.       As part of his duties as Chief Compliance Officer at Shreveport, in June of 2015 Relator began to prepare for an internal audit of ICD billing and coding.  Assisting Relator with the audit were his Compliance Investigator, the Monroe Compliance Officer, and a Shreveport nurse supervisor that was the Director of Case Management.

52.       During the preparation for the ICD audit process, Relator learned from the Monroe surgery manager that Monroe had not registered for the ACC-NCDR.  The surgery manager stated that she had complained about this issue to Monroe's finance department for more than one year.

53.       Relator and his compliance staff included the ACC-NCDR registry issue in their ongoing audit efforts.  On June 12, 2015, Relator received an e-mail from his investigator that attached CMS Transmittal 100-20 and the American Hospital Association Regulator Advisory cited herein, and wrote:

> "I talked to [nurse manager for the Shreveport cardiac cath. Lab] He's been here over 10 years and has been saying all along that we needed to be part of a registry.  He said we have not been putting any ICD information into any monitoring registry as mandated by CMS.  He said that he completed the application process in 2014, but by

the time the check request was finally approved, he had to resubmit the documentation."

54.     Relator, upon learning this information, informed the Shreveport CFO, Pat Keel. In the course of his investigation, Relator also learned that Pat Keel, prior to Relator's tenure at Shreveport, had been the one that had signed the 2014 ACC-NCDR application.   She had, however, signed it in March of 2015, well after the end of the ACC calendar-year based enrollment.

55.     Relator's Compliance Investigator was then tasked with preparing a report on the number of hospital patients involved from that time back to the fall of 2013 and the amounts of funds that might be required to be repaid to CMS for those patients.

56.     Also created was an Excel spreadsheet that showed the amount of Medicare and Medicaid billing related to ICDs.  Specifically, for the period from 2013 to approximately April of 2015, Defendants billed Medicare and Medicaid approximately $5 million related to ICD procedures.

57.     All charges reflected in the spreadsheet were accrued prior to Defendants' enrollment in the ACC-NCDR.  All claims for payment or approval made by Defendants for those charges also occurred before the Defendants' ACC-NCDR enrollment.

58.     The spreadsheet was created for the purpose of determining a portion of the Defendants' liability to Medicare and Medicaid for failing to comply with the ICD NCD registry requirement.

59.     In June 2015, Relator shared the completed report with Mitzi Green, the Director of Revenue Integrity, and briefed her on the issue of the requirement of the ICD data registry.

Because of his concerns about the lack of compliance with the ICD NCD, Relator instructed her to stop submitting ICD claims for government payment.

60.     By late June 2015, Relator had worked to bring the ICD data registry issue to the attention of the top administrative staff at Shreveport, including Rich Cascio, the CEO, and Mark Randolph, who was vice president of Clinical Services.

61.     Relator had multiple meetings with hospital CEO Rich Cascio about the ICD claims. Mr. Cascio approved of Relator's handling of the issue.

62.     Each time he met with senior administrative staff at Shreveport, Relator provided an overview of the CMS NCD requirements and the fact that Shreveport and Monroe were not in compliance with the NCD.

63.     In June 2015, Relator and his investigator called the American College of Cardiology and confirmed that neither Shreveport nor Monroe was registered.

64.     During June 2015, Shreveport and Monroe, based upon the spreadsheet created for this purpose, considered voluntarily repaying CMS for the deficient ICD claims back through October of 2013. Defendants chose not to do so.

65.     After Relator's employment with Shreveport ended in 2015, he met some of his former Shreveport and Monroe colleagues at a convention in April of 2016. Relator spoke with the former compliance officer for Monroe and asked, "how did you resolve the ICD registry issue?" She responded, "Tommy Rainbolt took care of it." Relator asked, "you paid it back?" and the colleague responded, "No. They [Rainbolt – the hospitals' information security director] removed [Relator's compliance investigator's] computer."

66.     As a result of Relator's investigation and efforts, both Shreveport and Monroe enrolled in the ACC-NCDR.

**D.      Defendants Knowingly Failed to Comply With the NCD Data Registry Requirements**

67.      Under the Medicare program, each hospital enters into provider agreements with CMS.  Upon entry into the Medicare program, hospitals and providers have a legal duty to know and understand Medicare's reimbursement rules, including the rules found in the Medicare Claims Processing Manual, the CMS Manual System, the Medicare Hospital Manual, as well as all National Coverage Determinations.

68.      Notice of the ICD NCD requirements, which Defendants were duty-bound to know, understand, and follow came not only from CMS directly, but from the hospitals' fiscal intermediary, from industry trade groups (e.g. the American Hospital Association), ICD manufacturers, and from internal hospital staff (cardiac surgery and lab managers).  The Shreveport cardiac lab manager had complained about the need to meet the requirement for 10 years prior to the hospitals' actual registration.

69.      Contemporaneously with the 2005 NCD, CMS also issued additional billing guidance for hospitals performing primary prevention ICD procedures on government beneficiaries.  On March 8, 2005, CMS published Transmittal 497, which addressed "Use of the QR Modifier to Identify Patient Registry Participation."  CMS Manual System, Pub. 100-04 Medicare Claims Processing, March 8, 2005: "For defibrillator claims, the appropriate use of the QR modifier is to identify patients whose data is being submitted to a data collection system and is therefore meeting the coverage requirement . . ."

70.      Transmittal 497 also required that the modifier be used in all ICD claims submitted to Medicare on or after April 1, 2005.

71.     Transmittal 497 only excluded non-primary prevention ICD procedures from the modifier requirements.

72.     Medicare also used Transmittal 497 to reiterate the purposes of the data collection requirement: "Medicare is also requiring that patients receiving a defibrillator for the new indications or for any indication that is for the primary prevention of sudden cardiac arrest . . . be enrolled in a data collection system to ensure the safety and quality of care."

73.     In 2008 Medicare eliminated the "QR" modifier and replaced it with the modifier "Q0." No other changes to the data registry requirements were made.  Transmittal 1418, CMS Manual System, Pub. 100-04 Medicare Claims Processing, January 18, 2008.  Hospitals were still required to use the Q0 modifier with all claims for primary prevention ICD reimbursement.

74.     Completion of claim forms for reimbursement from Medicare are the responsibility of the hospital.  Each claim for a primary prevention ICD procedure submitted to Medicare would have had to have a Q0 or QR modifier in order to be paid.

75.     Defendants, Shreveport and Monroe, all had to knowingly provide the QR or Q0 modifier to each primary prevention ICD claim.

76.     Each such indication of Q0 or QR for each hospital's primary prevention ICD claim would have affirmatively indicated compliance with the ICD NCD and that each hospital was enrolled in an approved data collection program (e.g. ACC-NCDR).  Without affirmatively making such an indication, Medicare would not have reimbursed the hospitals for the ICD procedures.

77.     Prior to July 21, 2015 for Shreveport and August 14, 2015 for Monroe, no prong of the NCD, enrollment in an FDA or CMS approved clinical trial, or enrollment in an approved data collection program, was ever satisfied.

78.     Prior to July 21, 2015 for Shreveport, and prior to August 14, 2015 for Monroe, each and every primary prevention ICD claim Shreveport and Monroe submitted to CMS was false because prior to those dates neither hospital was enrolled in an approved data collection program and neither hospital, therefore, could truthfully supply the QR or Q0 modifier to its ICD claims.

79.     Further, Transmittal 1418 required hospitals' compliance with the modifier changes no later than April 7, 2008.  Thus, in order that their primary prevention ICD claims would be reimbursed by Medicare after that date, Shreveport and Monroe would have had to be aware of the changes in order to alter their coding practices from QR to Q0.

80.     On its face, the ICD NCD provision ignored by Defendants was a condition of payment.   CMS's own transmittals and other publications make this abundantly clear: "Reporting data for primary prevention ICD implants is a requirement of Medicare coverage.  In order to obtain reimbursement, Medicare national coverage policy requires that providers implanting ICDs for primary prevention clinical indications . . . report data on each primary prevention ICD procedure." The Medicare Claims Processing Manual also frames the reporting requirement for ICD implants as a "billing requirement."

81.     By filing ACC-NCDR enrollment forms that specifically stated that Shreveport and Monroe had not previously been enrolled, Defendants admitted that more than ten years' worth of ICD implant claims had been fraudulently billed to the government.

82.     By billing the government for its primary prevention ICD implant procedures that required enrollment in a data collection plan, and by further completing claims with claim modifiers that specifically attested to Shreveport and Monroe's enrollment in approved data

collection plans, Defendants provided false information to the government that was material to the government's decision to pay the claims.

83.     Had the government known of Defendants' actions as described herein, Defendants' claims would not have been paid.

84.     Relator, in the performance of his duties as Chief Compliance Officer for Shreveport, had taken the steps necessary to investigate the ICD registry issue.  Having done so, he reported his findings to all levels of executive staff.

85.     Relator's investigatory efforts shined a light on ICD billing issue and he caused Shreveport and Monroe (1) to suspend all further ICD claim submissions until the matter was resolved, (2) to begin calculations of how much had been improperly billed by the Defendants needed to be returned to the government, and, (3) to complete their ACC-NCDR registration and payment for 2015.  After his report of the ICD billing problems and overpayments, Shreveport instituted significant changes in Relator's job functions.

86.     Upon being hired in 2014, Relator, as Chief Compliance Officer, reported directly to the Shreveport CEO, Rod Huebbers, and the Board of Directors.  In early 2015, Relator was instructed that he would now report to the Shreveport General Counsel, Holly Hargrove. The Shreveport General Counsel reported to the hospital CFO, who, in turn, reported to the Board of Directors.

87.     After making progress with his ICD claim investigation, which was a retroactive review of the specific CMS NCD for implantable defibrillators, Relator was informed by General Counsel, in her supervisory role, that he could no longer retroactively audit Shreveport against any CMS NCDs or CMS Local Coverage Determinations ("LCD") unless he could first prove

that he had previously trained hospital staff on the requirements of the NCD or LCD under audit consideration.

88.      As most, if not all, of the many auditable CMS NCDs and LCDs had been in place for many years., if not decades, they should have already been known and followed by hospital staff prior to Relator's tenure.  Further, as Relator had only worked at Shreveport for a little more than a year, he had done relatively little training.  Retrospective audits are one of a compliance officer's primary functions.  The effect of General Counsel's stricture, however, meant that Relator would be able to retrospectively audit virtually nothing at Shreveport or Monroe.

89.      As a direct result of Relator's actions related to the ICD billing issue, General Counsel, Ms. Hargrove, acting in her supervisory capacity, also told Relator that she, and the CFO, Pat Keel, "had seen a lot of compliance officers" and they thought that Relator, "was the kind of compliance officer that only wanted to audit retrospectively, find things, and send money back."  When asked what a compliance officer should be doing at Shreveport, Ms. Hargrove made no response.

90.      After being informed of the effective ban on his ability to perform retrospective audits, General Counsel informed Relator that he would be limited to performing only concurrent or prospective audits only in areas where he had already trained staff on the relevant NCD or LCD.  Relator was adjured to "only look forward," and to "never look back," when reviewing claims.

91.      To further frustrate Relator's ability to perform meaningful compliance work at Shreveport, the non-Board Defendants drastically cut the funding he requested for audits.  In March of 2015, prior to Relator raising the ICD claim issue, he had requested funding of $35,000

– enough, in his opinion, to do 6-7 full retrospective NCD or LCD audits, and an historically reasonable amount.

92.     A full retrospective audit begins with the review of 10 selected patient charts.  If there are errors in those 10 reports, additional review is performed using a greater number of charts.  If that secondary review continues to reveal issues, further audit functions are required and typically additional funds are requested to complete the review.

93.     After Relator reported the ICD claim issue to executive staff, the $35,000 in audit funds he had previously requested before the issue came to light was rejected.  Instead, the non-Board Defendants only approved a small fraction of that amount, providing only enough funds for Relator to perform 10 patient chart reviews at Monroe and 30 patient chart reviews at Shreveport.

94.     In other words, the non-Board Defendants cut audit funding to the point that instead of 6-7 full reviews, Monroe could only perform the first, 10-chart, stage of a single retrospective audit, but perform no secondary or other review, and Shreveport could only perform one initial 10-chart review and possibly a secondary review and nothing else.

95.     In the face of the significant changes made to his job and responsibilities in retaliation for his lawful actions, Relator had no reasonable choice but to resign his position at Shreveport.

96.     At all times relevant to this complaint, Defendants' conduct was knowing and willful.

## COUNT ONE: VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT:

### All Defendants

97.        Relator re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

98.        Defendants failed to comply with the CMS National Coverage Determination related to the implantation of ICD devices.  Specifically, Defendants failed to register with the ACC-NCDR when such registration was a billing requirement.  As a result, from the inception of the NCD in 2005 through 2015, Defendants knowingly presented false or fraudulent claims for payment, approval, credit or reimbursement and used or caused to be used false records or statements material to a false or fraudulent claim, in violation of 31 U.S.C. § 3729(a)(1)(A) & (B) (2009).

99.        Defendants further violated the federal False Claims Act by conspiring to defraud the government by getting a false or fraudulent claim allowed or paid, in violation of 31 U.S.C. § 3729(a)(1)(C) (2009).

100.        Finally, because the United States government paid for ICD services that it should not have paid for because Defendants knowingly did not comply with the NCD and Defendants' ICD patients were not enrolled in a data collection system, and because compliance and enrollment were required for Defendants to bill the government for those procedures, Defendants have retained overpayments in violation 31 U.S.C § 3729(a)(1)(D) (2009) and have knowingly and improperly avoided or decreased its obligation to transmit the windfall it has gained back to the Government in violation of 31 U.S.C. § 3729(a)(1)(G) (2009).

101.        Relator respectfully requests this Court to enter judgment against Defendants, as follows:

U.S. ex rel. Conkovich, et al. v. University Health System et al.
FALSE CLAIMS ACT COMPLAINT
*FILED UNDER SEAL*
Page 21 of 27

(a) That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged within this Complaint, as the Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq.* provides;

(b) That civil penalties of $11,000 be imposed for each and every false claim that defendants presented or caused to be presented to the United States;

(c) That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d) That the Court grant permanent injunctive relief to prevent any recurrence of violations of the False Claims Act for which redress is sought in this Complaint;

(e) That the Relator be awarded the maximum percentage of any recovery allowed to him pursuant the False Claims Act, 31 U.S.C. §3730(d)(1)(2);

(f) That this Court award such other and further relief as it deems proper.

## COUNT TWO: LOUSIANA MEDICAL ASSISTANCE PROGRAMS

### INTEGRITY LAW: All Defendants

102.        Relator re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.  Additionally, Relator states that the course of conduct described in this Complaint affected the state Medicaid program.  Defendants conduct business in the State of Louisiana.  Defendants' actions described herein occurred in Louisiana as well.

103.        This is a qui tam action brought by Relator and the State of Louisiana to recover treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La Rev. Stat. Ann § 437.1 et seq.

104.    La. Rev. Stat. Ann. § 438.3 provides –

No person shall knowingly present or cause to be presented a false or fraudulent claim;

No person shall knowingly engage in misrepresentation to obtain, or attempt to obtain, payment from medical assistance programs funds;

No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim;

105.    Defendants violated La. Rev. Stat. Ann. § 438.3 by engaging in misrepresentations and by knowingly causing false and fraudulent claims to be made, used and presented to the State of Louisiana, and by conspiring to do the same, from at least 2006 to the present as described herein.

106.    The State of Louisiana, by and through the Louisiana Medicaid program and other state health care programs, and unaware of Defendants' misrepresentations and false and fraudulent claims, paid the claims submitted by health care providers and third party payers in connection therewith.

107.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an express condition of payment of claims submitted to the State of Louisiana in connection with Defendants' false and fraudulent claims and misrepresentations.

108.    Had the State of Louisiana known that Defendants were violating the federal and state laws cited herein, it would not have paid Defendants' claims.

109.    As a result of Defendants' violations of La. Rev. Stat. Ann. § 438.3 the State of Louisiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

110.     Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to La. Rev. Stat. Ann. § 439.1(A) on behalf of himself and the State of Louisiana.

111.     This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Louisiana in the operation of its Medicaid program.

112.     WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the STATE OF LOUISIANA:

Three times the amount of actual damages which the State of Louisiana has sustained as a result of Defendants' false and fraudulent claims and misrepresentations;

A civil penalty of not less than $11,000 for each false and fraudulent claim or misrepresentation which Defendants caused to be presented to the State of Louisiana;

Prejudgment interest; and

All costs incurred in bringing this action.

To RELATOR:

The maximum amount allowed pursuant to La. Rev. Stat. § 439.4(A) and/or any other applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with this action;

An award or reasonable attorneys' fees and costs; and

Such further relief as this Court deems equitable and just.

## COUNT THREE: CLAIMS FOR RETALIATION
### PURSUANT TO 31 U.S.C. § 3730(H):  Defendants Biomedical Research Foundation of Northwest Louisiana, Inc., BRF Hospital Holdings L.L.C., BRFHH Shreveport, L.L.C., and BRFHH Monroe, L.L.C.,

113.     Plaintiff re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

114.     Relator engaged in lawful acts in furtherance of this action, including investigating and reporting to his superiors the fact that Shreveport and Monroe had been improperly billing the government for ICD implants since 2005.  Further, Relator learned and reported that various staff at the hospitals had known about the ICD NCD since its inception in 2005 and, more importantly, knew that the hospitals had never met government requirements for billing, despite receiving reimbursement from the government.

115.     As a result of his findings, Relator stopped all current ICD billing, assessed the extent of the hospitals' financial liability to the government for its non-compliance, took steps to conform hospital practice to CMS's ICD billing requirements, and alerted senior hospital executives to the issue multiple times.

116.     The non-Board Defendants were fully aware that, in so doing, Relator was engaged in protected activity and lawful acts to stop the hospitals from submitting claims to the government for ICD implant procedures when they had not complied with all of CMS's required conditions of billing.

117.     As a result of his actions, the non-Board Defendants retaliated against Relator, effectively eliminating his audit authority and capacity.  The non-Board Defendants slashed Relator's audit budget to where any audit process would have been ineffective, severely limited the areas and claims he could audit, and forbade him to perform any retrospective claim review.

The non-Board Defendants provided the relevant context for these changes by warning Relator that he was the kind of compliance officer who seemed to want, "to find things and send money back," making it clear that they did not want any retrospective claim review done.

118.     Given the drastic limitations placed upon his role as Chief Compliance Officer in retaliation for his lawful acts, Relator had no reasonable choice but to resign his position at Shreveport.   The non-Board Defendants' actions prior to Relator's resignation amount to a constructive discharge in violation of 31 U.S.C. § 3730(h).

119.     As a direct and proximate result of this unlawful and discriminatory discharge, Relator has suffered emotional pain and mental anguish, together with serious economic hardship, including lost wages and special damages associated with his efforts to obtain alternative employment, in an amount to be proven at trial.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all claims alleged herein.

Dated:   10/6/2016

Respectfully submitted,

By: _____

**THORNTON LAW FIRM, LLP**
Michael A. Lesser
100 Summer St, 30th Floor
Boston, MA 02110
Tel. 617-720-1333
mlesser@tenlaw.com

**WATERS & KRAUS, LLP**
Wm. Paul Lawrence II
Louisiana State Bar No. 8145
Washington D.C. Metro Office
37163 Mountville Rd.
Middleburg, VA 20117
Tel. 540-687-6999
plawrence@waterskraus.net